**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**

**v.**

**HAJI BAGCHO,**

**Defendant.**

**Crim. Action No.  06-00334 (ESH)**

---

<u>**MEMORANDUM OPINION**</u>

Before the Court is defendant Haji Bagcho's motion for a new trial.  (Defendant's Motion for New Trial, June 5, 2015 [ECF 105] ("Def's Mot.").)  Defendant was convicted in 2012 of three narcotics-related charges and sentenced to life in prison.  The government subsequently disclosed that, prior to trial, a U.S. government agency had concluded in June 2010 that one of the prosecution's principal witnesses, Kiramatuallah Shir Mohammed Khan ("Qari"), was a fabricator who had provided non-credible information to the agency.  (*See* Arthur G. Wyatt Letter to Sandra Rolland, September 22, 2015 ("Sept. 22 Letter").)  Defendant now argues that the prosecution's failure to disclose this agency's credibility assessment constituted a *Brady* violation, depriving him of a fair trial.

For the following reasons, the Court concludes that the government violated defendant's right to due process by failing to turn over the favorable impeachment evidence, but that the *Brady* evidence was only material to Count Four, which charged that defendant trafficked narcotics while funding terrorism in violation of 21 U.S.C. §§ 960(a), 841(a), and 841(b)(1)(A).

**BACKGROUND**

## I. FACTS

On January 28, 2010, the grand jury charged defendant with four offenses in a superseding indictment:  conspiracy from 2005 to 2010 to distribute one kilogram or more of heroin intending and knowing that the heroin would be unlawfully transported into the United States, in violation of 21 U.S.C. §§ 959, 963, and 960(b)(1)(A); distribution on September 25, 2006, of one kilogram or more of heroin intending and knowing that the heroin would be unlawfully transported into the United States, in violation of 21 U.S.C. §§ 959(a)(1), 959(a)(2), and 960(b)(1)(A); distribution on May 21, 2008, of one kilogram or more of heroin intending and knowing that the heroin would be unlawfully transported into the United States, in violation of 21 U.S.C. §§ 959(a)(1), 959(a)(2), and 960(b)(1)(A); and narcotics trafficking while funding terrorism, in violation of 21 U.S.C §§ 960(a), 841(a), and 841(b)(1)(A) ("narcoterrorism"). (Superseding Indictment, Jan. 28, 2010 [ECF 11].)  At the conclusion of defendant's first trial in November 2011, the jury was deadlocked on all counts and a mistrial was declared.

At the second trial, the prosecution's evidence proved that defendant ran a large heroin trafficking operation in Afghanistan, beginning during the time of Taliban rule and continuing after the American invasion in 2001.[1]  In support of the indictment, the government introduced extensive physical evidence, including tape-recorded conversations between defendant and co-conspirators about heroin transactions; heroin production, accounting, and packaging equipment seized from defendant's compound in a raid on October 9, 2006; drugs delivered to the government by DEA informants; and ledgers seized from an October 31, 2006 raid on the *sarafi* (or money-changing shop) of defendant's associate, Zahir Shah.

---

[1] Heroin distribution was apparently legal under the Taliban.

The prosecution also relied on U.S. and Afghan law enforcement officials and several Afghan civilians.  Count One (conspiracy) was supported by testimony from DEA Agents Higgins, Thompson, Cowles, Brittain and Mah; undercover informants known as Farid and Qari; undercover Afghan police officers Captain Javid, Colonel Shaheen, and Captain Yaseen; and various experts.  Count Two (2006 distribution) relied on the testimony of Agent Higgins, Agent Cowles, Captain Javid, and Farid.  Count Three (2008 distribution) was supported by testimony from Agent Mah, Qari, and Captain Yaseen.  Count Four (narcoterrorism) was based almost entirely on Qari's testimony.

As a longtime confidant and employee of defendant, Qari provided the most wide-ranging testimony of any witness.  According to Qari, he began working for defendant's son, Sacha Gul, in late 1998.  Qari testified that Sacha Gul received phone calls from his father about drug transactions and then wrote corresponding entries into accounting ledgers, including some in foreign currency amounts.  At some point after the American invasion in 2001, Qari was employed by the defendant.  He served as a teacher for defendant's children, but also worked in the heroin-trafficking operation and lab, where he helped stir the opium in drums and then packaged it for distribution using a heat-sealing machine.

A few months before the October 9, 2006 raid by DEA agents on defendant's compound,[2] defendant partnered with individuals whom Qari identified as Haji Ghayrat and Haji Bakhti[3] to send 250 kilograms of heroin to America and advised his chemist Fahrman Shah to prepare the drugs quickly.  Qari testified that defendant then celebrated the deal by throwing an

---

[2] Since Qari often had difficulty pinpointing specific dates for relevant events, he used the October raid as a temporal 'before and after' reference point in his testimony.

[3] "Haji" is an honorific title given to Muslims who complete the pilgrimage (or Hajj) to Mecca.

enormous party that included sheep sacrifices.  Qari described defendant's female employees

fasting in order to swallow large amounts of the heroin to transport to the United States.  He also

testified to another deal that occurred around the same time period, shortly before the October

raid, between defendant and Haji Wazyat to distribute one thousand kilograms of heroin.[4]

Qari was present at defendant's compound for the October 9, 2006 raid and was

handcuffed by the DEA, but not arrested.  He testified that afterward he began fearing the

American government, which in turn prompted him to begin working for the DEA on multiple

cases and investigations.  Qari first met with the DEA in September 2007, but signed his

cooperation agreement with the agency on May 27, 2008.  He insisted that he did not agree to

help the DEA for financial reasons, despite receiving $45,000; instead, he wanted to stop the

flow of heroin and move out of defendant's home.  Qari also testified that he liked working for

the Americans and hated the Taliban.

Following the raid, defendant moved to Pakistan.  The DEA enlisted Qari, an individual

named Mukhabir, and Captain Yaseen in a plan where they sought to involve defendant in a fake

deal to send heroin to Japan and the United States.  In April 2008, Qari and Mukhabir recorded

conversations with defendant about executing such a deal.  Then, on May 21, 2008, Qari testified

that he, Mukhabir, and Captain Yaseen (with DEA coordination and support) sold a 4 kilogram

sample of heroin on defendant's behalf as part of a "controlled buy."  On July 9, 2008, defendant

revealed to Qari in a phone call that he knew he was working for the DEA, and as a result, he cut

off communications for a period of time.

According to Qari, both before and after the October 2006 raid, defendant was funneling

money, weapons, and supplies to members of the Taliban to support jihad.  He first mentioned

---

[4] According to Qari, the narcotics from this deal were eventually seized by the police.

this connection to the Taliban in a meeting with the DEA on October 10, 2008.  Qari described

multiple meetings between Sacha Gul, himself, and Taliban Commander Garq Parq Maftoon—

including a meeting at defendant's home—where they gave money on behalf of defendant to

Maftoon.  Qari also testified that defendant sent weapons and supplies via heroin smugglers to

Taliban Commander Khona and to the Hayatabad base of another Taliban fighter named Mulawi

Kabir, adding that defendant kept a record of his transactions with the Taliban in a pocket

notebook.

Defense counsel vigorously cross-examined Qari.  Counsel probed Qari's frequent

confusion over the sequence of events and attacked his credibility by asking about discrepancies

between Qari's testimony in the first and second trials, as well as the financial and immigration

benefits he received from the DEA.[5]  Defense counsel also probed the issue of why, despite

meeting with the DEA for over a year, Qari failed to mention the connection between defendant

and the Taliban until October 2008.

The jury convicted defendant of Counts One, Two, and Four, but acquitted on Count

Three.  (Verdict Form, Mar. 13, 2012 [ECF 78]).  He was sentenced to life imprisonment for

each count, to be served concurrently.  (Judgment, June 13, 2012 [ECF 94].)

## II.  PROCEDURAL POSTURE

The government first notified defense counsel on April 13, 2015 that information

concerning Qari had come to the attention of the Justice Department.  (Def's Mot., Ex. 3.)  The

letter disclosed that "[p]rior to the 2012 trial, a U.S. government agency concluded that Qari had

made statements that were not credible and that Qari was therefore a fabricator." (*Id.*)  On June

---

[5] The DEA first discussed these immigration benefits with Qari on August 22, 2010, when agents
discussed acquiring a visa for trial and the possibility of applying for residency status in the
United States.  (Trial Tr., Vol. 12, Mar. 7, 2012, at 65.)

5, 2015, defendant filed a motion for a new trial and a motion to compel disclosure of the newly discovered evidence.  (*See* Def's Mot.; Def's Motion to Compel, June 5, 2015 [ECF 106].)

On July 1, 2015, the government sent defendant a follow-up letter that provided an unclassified summary of the underlying classified records.  (Gov's Consolidated Response, July 20, 2015 [ECF 111] ("Gov's Consolidated Response"), Ex. 3.)  On July 20, 2015, the government filed its response to both motions, asking the Court to grant it 45 additional days to file an *ex parte*, *in camera* motion under Section 4 of the Classified Information Procedure Act, 18. U.S.C. App. III ("CIPA").  (Gov's Consolidated Response at 8.)  To determine whether the underlying classified evidence had to be disclosed, the Court ordered the government to file an *ex parte, in camera* motion pursuant to Section 4 of CIPA, and to provide the classified information for the Court's *in camera* review.  (Order, July 27, 2015 [ECF 113].)

The government filed its CIPA motion with the Court's Classified Information Security Officer on August 20, 2015, and the Court held an *ex parte, in camera* CIPA hearing on September 1, 2015.  *See* CIPA § 5.  On September 22, 2015, the Court ordered the government to deliver a revised, supplemented version of its July 1 letter to defense counsel, granted the government's CIPA motion, and denied defendant's motion to compel additional discovery. (Order, Sept. 22, 2015 [ECF 132].)

After delivering the revised letter to defense counsel on September 22, 2015, the government filed its opposition to defendant's motion for a new trial on October 2, 2015. (Government's Opposition to Defendant's Motion for New Trial, Oct. 2, 2015 [ECF 134] ("Gov's Opp'n").  Defendant filed his Reply on October 28, 2015.  (Def's Reply to Gov's Opposition to Motion for New Trial, Oct. 28, 2015 [ECF 136] ("Def's Reply").)

### III.  UNCLASSIFIED SUMMARY OF UNDERLYING EVIDENCE

The government's September 22, 2015 letter disclosed that, from November 2009 to June 2010, Qari had provided information to a U.S. government agency via a third party for sums totaling "less than $10,000." (Sept. 22 Letter at 2.)  In relevant part, the information pertained to Maftoon, one of the Taliban commanders prominently featured in Qari's trial testimony.  (*Id.* at 1.)  In June 2010, the U.S. government agency concluded that Qari's statements about an alleged May 2010 trip to Maftoon's compound and various terrorism targets were not credible based on the agency's view that "the statements regarding counterterrorism matters seemed unrealistic and sensational." (*Id.*)  According to the government, there was no further investigation into the veracity of Qari's claims, but the U.S. government agency concluded that Qari was "likely a fabricator and/or information peddler," and in June 2010, directed the third party to cease contact with Qari.  (*Id.*)  When the government agency received a report from the DEA detailing information that Qari had provided directly to the DEA, the agency "informed a DEA employee in the Kabul, Afghanistan office of its conclusion that Qari was a fabricator."  (*Id.*)  According to the government, this information was stored in government records, but the prosecution failed to discover it during its searches for *Brady* material prior to defendant's two trials "due to discrepancies in the spelling of Qari's name." (Gov's Opp'n at 3 n.2.)

On or about May 29, 2014, an Assistant United States Attorney for the Southern District of New York contacted the DOJ's Narcotic and Dangerous Drug Section (NDDS) to inquire about defendant's case and the witnesses involved.  During this conversation and subsequent review of agency records, NDDS apparently learned for the first time that the potential impeachment material existed, but was not turned over prior to trial.  (Gov's Opp'n at 3.)  The September 22 letter from DOJ further disclosed that, following the discovery of the evidence, at

least one other federal prosecution that had used Qari as an informant was dropped.  (*See* Sept. 22 Letter at 2 ("The evidence to support the conviction was, in part, based on information provided by Qari. Based on a number of factors, including…the allegations about Qari referenced in NDDS's April 14, 2015 letter, the National Security Division decided not to approve the criminal complaint at that time.").)  Finally, the government represents that its searches of the DEA Kabul Office in late 2014 failed to uncover any record of the inter-agency communication regarding Qari's credibility.  (*Id.*)

## DISCUSSION

### I. *BRADY* VIOLATION

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The government violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's conviction.  *Smith v. Cain*, 132 S.Ct. 627, 630 (U.S. 2012) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  The post-trial disclosure of new evidence by the government therefore warrants a new trial when three requirements are met: (1) the evidence is favorable to the accused because it is exculpatory or impeaching, *see United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence…falls within the *Brady* rule.") (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)); (2) the evidence was suppressed by the government either willfully or inadvertently, including instances where only government investigators were aware of it, *see Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case"); and (3) the evidence was material. *Smith*, 132 S.Ct. at 630.

The government does not dispute that defendant satisfies the first two elements.  It is clearly favorable to defendant that a U.S. government agency characterized the most prominent witness against him as a fabricator after that witness made non-credible statements about an individual who was a subject of his testimony at trial, and then proceeded to notify the DEA of that assessment.  (*See* Gov's Opp'n at 6 ("In *Giglio*, the Court held that evidence bearing on a witness's credibility is included within the types of evidence covered by *Brady* as being favorable to the defendant.") (citing *Giglio*, 405 U.S. at 154).)  That the government's good-faith behavior nevertheless constituted suppression is equally uncontestable.  (*See* Gov's Opp'n at 7 ("[T]he newly discovered evidence was in the possession of a federal government agency prior to both trials.  Despite a search of agency records, government counsel did not locate the evidence in question and, consequently, did not provide it to the defendant prior to the trials.").)

Defendant's motion for a new trial thus rises or falls based upon whether the impeachment evidence was material.

## II.  MATERIALITY OF EVIDENCE

Suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.  Reasonable probability is lower than a preponderance standard, but demanding enough that the suppression "undermine[s] confidence in the outcome of the trial." *U.S. v. Bowie,* 198 F.3d 905, 908 (D.C. Cir. 1999) (citing *Kyles,* 514 U.S. at 434).  In other words, the question "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.

In response to defendant's claim that the suppressed evidence undermines confidence in the jury's verdict, the government argues that the "impeachment value" of the favorable evidence "is marginal" for two reasons: (1) the agency's credibility determination would have been inadmissible hearsay and thus could not have affected the trial; and (2) even assuming it *were* admissible, the evidence would not have affected the verdict because the impeachment would have been cumulative, and Qari's testimony was corroborated by other evidence.  (Gov's Opp'n at 5).

The Court will now turn to these two arguments.

## A.  Use and Admissibility of the Evidence at Trial

In order for the impeachment evidence to be material, it must have provided some plausible utility in undermining the prosecution's case.  The government is therefore correct that, at minimum, the agency's conclusion that Qari was a fabricator must either have been admissible or provided defense counsel with a plausible avenue for damaging the government's case on cross-examination.  *See Bowie*, U.S. at 911 ("When the undisclosed *Brady* material consists of impeachment evidence, a court seeking to determine the probable impact of the violation must form some idea about how effectively the evidence could have been used in cross-examination.").

The government argues that the agency's assessment that Qari was a liar constitutes inadmissible hearsay.  But a statement is not hearsay if the statement is offered against an opposing party and the statement is either "made by the party's agent or employee on a matter within the scope of that relationship while it existed," Fed. R. Evid. 801(d)(2)(D), or "is one the party manifested that it adopted or believed to be true."  Fed. R. Evid. 801(d)(2)(B).

It is arguable that the agency's credibility determination would be admissible under Federal Rule of Evidence 801(d)(2)(D) as a statement of an agent of the federal government.  In criminal cases, the breadth of the "party-opponent" umbrella has become a matter of some debate, as courts have disagreed over whether the entire federal government falls within the term's ambit.  *Compare, e.g.*, *United States v. Kattar*, 840 F.2d 118, 130 (1ˢᵗ Cir. 1988) (doubting "whether or not the entire federal government in all its capacities should be deemed a party-opponent in criminal cases"); *U.S. v. Ballou*, 59 F.Supp.3d 1038, 1075 (D.N.M. 2014) ("A more reasonable construction is that…only Department of Justice employees' statements are attributable to the United States and admissible under rule 801(d)(2)(D), *with United States v. Morgan*, 581 F.2d 933, 937 n.10 (D.C. Cir. 1978) ("We note that the Federal Rules clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases, and specifically provide that in certain circumstances statements made by government agents are admissible against the government as substantive evidence."); *U.S. v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996) (where the "government concede[d] that Rule 801(d)(2)(D) contemplates that the federal government is a party-opponent of the defendant in a criminal case").

The D.C. Circuit has historically treated out-of-court statements by government employees more expansively than most jurisdictions.  *See United States v. Warren,* 42 F.3d 647, 655–56 (D.C. Cir. 1994) (admitting statements by a police officer under Rule 801(d)(2)); *Morgan*, 581 F.2d at 937 n.11 (admitting an out-of-court statement by a police informant); *U.S. v. American Tel. & Tel. Co.*. 498 F.Supp. 353, 358 (D.D.C. 1980) ("reject[ing] the proposition

that the plaintiff…is the Department of Justice" and admitting out-of-court statements by members of separate U.S. government agencies).[6]

However, these cases frequently distinguish out-of-court statements that the Justice Department has blessed as trustworthy from those which the government challenges.  *See Warren*, 42 F.3d at 655 ("Where, as here, the government has indicated in a sworn affidavit to a judicial officer that it believes particular statements are trustworthy, it may not sustain an objection to the subsequent introduction of those statements on grounds that they are hearsay.") (citations omitted); *Morgan*, 581 F.2d at 938 ("Clearly, statements in which the government has manifested its adoption or belief stand on more solid ground than mere out-of-court assertions by a government agent. We do not decide that just any statement the informant might have made is admissible against the government."); *see also U.S. v. Kattar*, 840 F.2d 118, 131 (1st Cir. 1988) (holding that once a prosecution indicates that certain statements by its agents are trustworthy, it cannot then argue that they constitute inadmissible hearsay).  Thus, in the criminal context, judicial interpretation of Rule 801(d)(2)(D) (covering agents' statements) has actually been colored by Rule 801(d)(2)(B) (covering adopted statements). The D.C. Circuit appears to be motivated by the principle that holding the government to the assertions of a public official who is unrelated to the prosecution is unfair, unless the government manifestly adopts the statement before the court.

Of course, in this case, the government has tried to belittle the U.S. agency's credibility assessment of Qari, calling it "unsubstantiated, conclusory, and unreliable."  (Gov's Opp'n at

---

[6]  Scholarship on the subject suggests that the D.C. Circuit's treatment of Rule 801(d)(2)(D) may be gaining traction in other circuits.  *See* FEDERAL PRACTICE: EVIDENCE § 7023, at 221 n. 11 (2014 ed.) (citing the *Morgan* decision to suggest that other circuits' more restrictive view of the government agents' out-of-court statements may be on the wane).

12.)  Given the precedents in this Circuit, the Court must agree that the agency determination is inadmissible for proving the truth of the matter asserted—that Qari *is*, in fact, a fabricator.

That does not, however, completely close the door on admissibility.  In its submissions and the September 22 letter, the government "has, as clearly as possible, manifested its belief" that the U.S. government agency communicated to DEA headquarters in Kabul, Afghanistan its determination that Qari was not a credible informant.  *Kattar,* 840 F.2d at 131; *see also U.S. v. Yildiz,* 355 F.3d 80, 82 (2d Cir. 2004) (DOJ lawyers can bind the government with Rule 801(2)(B) adoptions in filings); *Warren,* 42 F.3d at 655 (holding that when "the government has indicated in a sworn affidavit to a judicial officer that it believes particular statements are trustworthy, it may not sustain an objection to the subsequent introduction of those statements on grounds that they are hearsay").  Even if the hearsay-within-hearsay problem would not permit defense counsel to introduce the agency's adverse credibility determination to prove the truth of the matter asserted (i.e. that Qari is an unreliable information-peddler who lied about Maftoon), *see* Fed. R. Evid. 805, defense counsel could have introduced the communicated assessment[7] as evidence that the DEA *received notice* that another division of the government had designated Qari as a non-credible source of information—a designation inspired by incredible statements about Maftoon, who was a central figure in Qari's testimony.

Impeachment evidence can be damaging when it allows defense counsel to attack the reliability of an investigation.  *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A

---

[7]  Section 5(F) of CIPA allows the court to "authorize presentation of classified information at trial by summary or authorize admissions that would render the presentation of classified information unnecessary."  When the Court granted the government's CIPA motion, it authorized the production of an unclassified summary of the credibility evidence.  (Order, Sept. 22, 2015 [ECF 132].)  At trial, the Court could have permitted presentation of the evidence that the agency notified the DEA of its characterization of Qari in the form of the unclassified letter or by admission.  CIPA, § 5.

common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation."); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding a new trial after *Brady* evidence "carried within it the potential… for the… discrediting… of the police methods employed in assembling the case").

In *Kyles v. Whitley*, the Supreme Court considered a possible *Brady* violation where the government withheld various incriminating statements by a cooperating source named Beanie, the disclosure of which would have made the investigation of defendant look inept.  As the Court explained, "the defense could have examined the police to good effect on their knowledge of Beanie's statements and … attacked the reliability of the investigation in failing even to consider Beanie's possible guilt."  *Kyles,* 514 U.S. at 446.  The *Kyles* Court proceeded to re-construct the detectives' testimony in the case:

> By demonstrating the detectives' knowledge of Beanie's affirmatively self-incriminating statements, the defense could have laid the foundation for a vigorous argument that the police had been guilty of negligence.…Since the police admittedly never treated Beanie as a suspect, the defense could thus have used his statements to throw the reliability of the investigation into doubt and to sully the credibility of Detective Dillman, who testified that Beanie was never a suspect.

*Id.* at 447.  The suppressed evidence in *Kyles* would also have opened up other avenues of embarrassing cross-examination as to the inadequacy of the police investigation, including the fact that the police "never even bothered to check [Beanie's] story against known fact" and that the police's list of cars at the crime scene was incomplete, all of which "would simply have underscored the unreliability of the investigation and complemented the defense's attack on the failure to treat Beanie as a suspect and his statements with a presumption of fallibility."  *Id.* at 450-51.  The *Kyles* Court ultimately concluded that, with the *Brady* material, the jury may have judged the lead police detective to be "either less than wholly candid or less than fully informed"

14

and the investigation to be limited in scope, negligent in method, and "insufficiently probing" of the cooperators' credibility.  *Id.* at 453-54.

Evidence that the DEA's Kabul office was told that Qari had been deemed a liar by another government agency, yet still it elected to use him as a witness would serve to undermine the reliability of the government's investigation and its sources.  The DEA agents who testified at trial could have been cross-examined as the detectives were in *Kyles*.  Defense counsel could have asked them whether they were stationed in the Kabul Office at the time of the inter-agency communication, and what they knew about the other agency's conclusion as to Qari's credibility. If the agents responded affirmatively, defense counsel could have inquired why they chose to continue working with Qari as a cooperator.  If they pleaded ignorance, defense counsel could have suggested that the DEA agents had turned a blind eye to information that had been available to them.  Defense counsel also could have asked the agents about the DEA's protocols for storing and searching records: how could there be no remaining records of the inter-agency communication anywhere at the Kabul office, and how could the DEA have failed to properly search Qari's name prior to trial?  (*See* Sept. 22 Letter at 2.)

Agent Mah testified that his confidential sources must "provide truthful information at all times" (Trial Tr., Vol. 7, Feb. 29, 2012, at 177), because it is "important that CSs provide truthful information so we could have reliable information," and he described the contract that Qari signed promising to "provide truthful information at all times."  (*Id.* at 181.)  Defense counsel could have asked how Agent Mah would have viewed Qari's compliance with his contract if the credibility assessment had been passed along to him.  Similarly, when Agent Higgins testified that the thousands of dollars in payments to Qari by the DEA was "commensurate with the value of the information or the services rendered" (Trial Tr., Vol. 12,

March 7, 2012, at 33), defense counsel could have challenged whether Agent Higgins would have valued the benefit of the information provided by Qari differently, knowing the details of the credibility assessment.  Finally, would it have made the DEA agents more skeptical of Qari's motivations for continuing to cooperate after being cut off by his other source of U.S. government income in June 2010?

A judge has a great deal of discretion in limiting the scope of cross-examination under Rule 403 and Rule 608(b), but a court would have likely permitted enough of the aforementioned attack on the integrity of the investigation for defense counsel to create, at least, an impression of sloppy, bureaucratic bumbling.  *See Bowie,* 198 F.3d at 909 (when imagining hypothetical cross-examinations for purposes of materiality analysis, "certainty is not necessary").  Like Beanie in *Kyles*, Qari was "essential to [the] investigation."  *Kyles*, U.S. at 445.  The fact that the DEA appears to have ignored or failed to learn of the other agency's unfavorable assessment of Qari could suggest to the jury either innocent, organizational incompetence or an "uncritical readiness to accept the stories and suggestions of" Qari.  *Id.* at 454; *see also United States v. Quinn*, 537 F. Supp. 2d 99, 115 (D.D.C. 2008) (defendant could have portrayed evidence that government failed to investigate suspicions about a key witness's credibility "as willful ignorance, and the jury might question why the lead case agent would not actively seek out the truth on this important point before continuing with a prosecution").  Moreover, the government's inability to locate Qari in the inter-agency database due to name misspellings and the apparent loss of records would (like the incomplete list of cars parked at the crime scene in *Kyles*) "simply have underscored the unreliability of the investigation."  *Id.* at 450-51.

In addition to impugning the government's investigation, defense counsel could have deployed the suppressed evidence to show Qari's bias on cross-examination.  When asked

whether he gave truthful information to the DEA agents in the investigation of defendant, Qari

responded "Yes, absolutely."  (Trial Tr., Vol. 10, March 5, 2012, at 127.)  Although extrinsic

evidence is not admissible to impeach a witness's general credibility, it is admissible to show

bias.  *See U.S. v. Abel*, 469 U.S. 45, 46 (U.S. 1984); *U.S. v. Robinson***,** 530 F.2d 1076, 1079 (D.C.

Cir. 1976) ("Ordinarily a witness may not be impeached as to credibility by producing extrinsic

evidence of prior instances of misconduct short of conviction… This rule stands firm enough

when the question is one of impeaching the general credibility of the person as a witness. It does

not apply, however, so as to limit or exclude proof of conduct by the witness evidencing a

specific bias for or against a party.").  Defense counsel could have suggested to the jury that,

when the other agency terminated its relationship with Qari in June 2010, he became more

predisposed to please the DEA, upon whom he depended for money and relocation.  Defense

counsel could have cross-examined Qari as to whether he worked for other agencies besides the

DEA and whether, to Qari's knowledge, those agencies always remained confident in the

reliability of his information.  Defense counsel might have been able to introduce the extrinsic

evidence of the adverse credibility assessment and resulting removal of Qari from the agency's

financial payroll to suggest that Qari was more likely to be partial in the DEA's case against

defendant.  *See* WEINSTEIN'S EVIDENCE (3rd ed.), at 607-17 (1975) ("Bias is never classified

as a collateral matter which lies beyond the scope of inquiry, nor as a matter on which an

examiner *is required to take a witness's answer*. Bias may be proved by extrinsic evidence even

after a witness's disavowal of partiality.") (emphasis added).  The jury could reasonably have

determined that, after Qari's financial future in Afghanistan as an agency informant became less

promising in June 2010, he became increasingly eager to prove his value to the DEA to continue

obtaining payments and residency in the United States.  (S*ee* Trial Tr., Vol. 12, Mar. 7, 2012, at

65 (Agent Higgins, stating that Qari and the DEA first discussed the possibility of immigration benefits on August 22, 2010); Trial Tr., Vol. 8, March 1, 2012, at 117-18 (Qari and his entire family were relocated to the United States).

The Court agrees with the government that defendant's efforts to prod Qari into damaging admissions regarding his lack of truthfulness in the past would not have been particularly successful. In a similar case, *U.S. v. Bowie*, the D.C. Circuit considered the probable effect of cross-examining a police officer witness to a crime, using previously suppressed evidence that the officer was already under investigation by the United States Attorney's Office regarding his testimony in an unrelated criminal case. *See* 198 F.3d at 907. After finding that the evidence would not have been admissible, the *Bowie* Court constructed an extensive hypothetical cross-examination of Officer Moses. It found that the judge would have held that defendant could not "establish[] that Moses was untruthful in the prior case," and that the officer almost certainly would have answered that it was "news to [him]" that he was on a list of officers being investigated for perjury and that he was not worried about any such investigation, saying "I wasn't worried at all because I told the truth then and I'm telling the truth now." *Id.* at 910-11 (finding that the Court would prevent further questioning because "those on the list are not normally told they are being investigated. It would be highly unusual for an officer to know this. He said he didn't know. You asked the question and now you must accept the answer"). The *Bowie* Court was dubious that such an exchange would have caused extensive damage to the witness's credibility. *See id.* at 911 ("How likely is it that the cross-examination of Moses would have been devastating? Not very, even if the Perry Mason of our day were defending Bowie.") The D.C. Circuit nevertheless admitted that "it is hard to know what effect such questioning

would have had on the jury's assessment of Moses's truthfulness" and relied on the fact that Moses's testimony was corroborated by another police officer. *Id.*

As in the case of Officer Moses, evidence that Qari *actually lied* about Maftoon to the other agency would not have been admissible, and it is unlikely that Qari would have known that a U.S. agency had officially dubbed him a fabricator. Nevertheless, as the *Bowie* Court noted, predicting the effect of such an inquiry on the jury is difficult. Moreover, unlike *Bowie*, evidence of the agency's adverse credibility assessment and subsequent termination of Qari as a discredited informant may have been admissible as extrinsic evidence to suggest bias.[8]

## B.  Effect of the Impeachment Evidence on the Verdict

Materiality is not a sufficiency of evidence test. *Kyles*, 514 U.S. at 434; *see also Strickler v. Greene*, 527 U.S. 263, 290 (1999) ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."). But it "must be evaluated in the context of the entire record." *U.S. v. Agurs*, 427 U.S. 97, 112 (1976).

Impeachment evidence may not be material if it is cumulative of the cross-examination that actually occurred at trial. *United States v. Emor*, 573 F.3d 778, 782 (D.C. Cir. 2009). The

---

[8]     The Court is unpersuaded by defendant's insistence that he could have called as a witness the unknown U.S. government agent(s) who formed the agency conclusion that Qari was a fabricator. (*See, e.g.*, Def's Reply at 6 (the Agent could "testify that Qari provided false information about Maftoon and others"). Even setting aside concerns over classified information, the government stated in its unclassified summary that it has been unable to find any record of the agency's communication of its credibility determination, which appears to include the identity of the specific employees who formed the original assessment and contacted the Kabul DEA Office. (Sept. 22 Letter at 2.) Materiality analysis under *Brady* requires some degree of re-imagination of an alternate trial where suppressed evidence has been disclosed, but it does not require that all details associated with the formation, discovery, and transmission of such evidence be perfectly catalogued and turned over. As previously discussed, defendant would be entitled to point out those gaps in the evidence that could suggest ineptitude by the government and unreliability in the investigation.

suppressed credibility evidence here would not have been cumulative.  It is true that defense counsel cross-examined Qari at great length, probing his credibility with questions about "his progressive truth telling" and his meetings with Maftoon (Gov's Opp'n at 16), yet "the fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial."  *U.S. v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (citations omitted). Undisclosed impeachment evidence "can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence."  *Id.* at 518.  As discussed, the undisclosed evidence would have allowed the defense to not just generally impeach Qari's testimony, but also to cast doubt on the credibility of the DEA investigators who failed to properly receive and/or act upon notice of an unreliable informer. Moreover, the additional $10,000 Qari received from the other agency suggests bias that is different from the bias created by the payments that were disclosed at trial.  Cross-examination regarding how the other U.S. government agency cut off its payments to Qari in June 2010 would not have been cumulative either, since it would serve purposes that were unavailable to defense counsel: first, to substantiate the other agency's conviction in its credibility assessment, and second, to imply to the jury that losing that source of income could have motivated Qari to embellish his testimony.

Alternatively, suppressed evidence may not be material "if the government's other evidence is strong enough to sustain confidence in the verdict," *Smith*, S.Ct. at 630, or the impeached testimony is corroborated by other unimpaired evidence, such as unimpeached testimony or physical evidence.  *See Bowie*, 198 F.3d at 911.  In a case involving convictions for multiple counts, analysis of whether confidence in the verdict remains "must be assessed count by count."  *United States v. Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010); *see also United States*

*v. Oruche*, 484 F.3d 590, 597 (D.C. Cir. 2007) (convictions for certain counts are not "placed in doubt simply because testimony on other counts is challenged"); *United States v. Lloyd*, 71 F.3d 408, 412-13 (D.C. Cir. 1995) (finding *Brady* evidence was material and therefore merited a new trial for Counts Seven and Eleven of the indictment, but not Counts Three and Five).  The Court thus considers the materiality of the evidence to the convictions on Counts One, Two, and Four separately below:

    **1.   *Count One***

    Count One charged a conspiracy from 2005 to 2010 to distribute one kilogram or more of heroin intending and knowing that the heroin would be unlawfully transported into the United States.  There is no question that Qari provided substantial testimony about defendant's heroin-trafficking network and the ongoing conspiracy with other individuals to distribute heroin intended for sale in the United States.  But Qari's testimony of a conspiracy was amply corroborated by both physical evidence and other witnesses.  *See Bowie*, 198 F.3d at 911 (finding it decisive that an officer whose testimony was undamaged corroborated and bolstered the testimony of the impeached officer).  That aforementioned physical evidence includes, *inter alia,* the drug samples obtained by the DEA in the controlled buys; the heroin-production material seized from defendant's compound in the October 9, 2006 raid; the taped conversations between defendant and various co-conspirators discussing drug distribution to the United States, including calls between Farid and defendant discussing the 2006 sale and calls between Qari and defendant discussing a deal to send heroin to Japan and the United States; and the accounting ledgers taken from defendant's compound in the October 9 raid and from Zahir Shah's *sarafi* shop in the October 31, 2006 raid.

    A court must consider the evidence "remaining unscathed" even where the investigation

process itself, and not a specific witness, has been undermined.  *See Kyles,* 514 U.S. at 451 ("not

every item of the State's case would have been directly undercut if the *Brady* evidence had been

disclosed," and in particular, the physical evidence).  For Count One, the sheer volume of

"unscathed" evidence makes it impossible to conclude that the disclosed evidence would have

resulted in a different verdict.

### 2.  *Count Two*

Count Two charged distribution on September 25, 2006, of one kilogram or more of

heroin intending and knowing that the heroin would be unlawfully transported into the United

States.  None of Qari's testimony applied to the September 25, 2006 controlled buy.  Moreover,

the conviction can be sustained almost exclusively by other evidence, including tape-recorded

phone calls between defendant and Farid saying the heroin will go to the United States, the

ledger memorializing the transaction that was seized from Zahir Shah's stall, and the physical

delivery of 2 kilos of heroin seized by the DEA.  Thus, even had the undisclosed evidence

undermined the jury's confidence in the reliability of the entire DEA investigation,

overwhelming evidence corroborates the testimony in support of the conviction on Count Two.

### 3.  *Count Four*

In stark contrast to the other counts, the narcoterrorism charge relied exclusively on

Qari's testimony.  Qari testified that defendant made a series of payments through his son, Sacha

Gul, to multiple terrorists associated with the Taliban, including Maftoon, Commander Khona,

and Maulawi Kabir.  The government does not dispute that virtually no other evidence

corroborates the key elements of Qari's testimony.  To convict defendant of Count Four, the jury

would have had to believe Qari's statements about these payments.  *See Cuffie*, 80 F.3d at 518

(evidence impeaching a witness's credibility was material to drug-related conviction because the

witness's testimony "established *the only direct connection* between [defendant] and the drugs")
(emphasis added).

Moreover, the fact that the DOJ National Security Division dropped separate criminal
charges that relied on Qari's testimony after discovering the *Brady* evidence only buttresses the
Court's conviction that Qari's contribution was material to the verdict.  A materiality inquiry
warrants consideration not only of the defense's plausible use of evidence, but also how the
government may have responded to the disclosure.  *See United States v. Gale*, 326 F.3d 228, 229
(D.C. Cir. 2003) (considering a hypothetical trial where the government is forced to disclose
impeachment evidence and makes the strategic adjustment of using a less vulnerable witness);
*United States v. Jones*, 84 F. Supp.2d 124, 126 (D.D.C. 1999) (evidence impeaching a
detective's credibility "would have kept [him] from taking the stand at all" because the detective
"would not have been a witness if government counsel knew that over the years [he] lied").  In
this case, there is no indication that the government had a different witness to substitute for Qari.
In view of the government's decision not to bring charges in another recent case and the fact that
it relied exclusively on Qari's testimony for the narcoterrorism count, it's entirely plausible that
the government would have simply dropped Count Four from the indictment.

Finally, as defendant points out, there is some indication that the jury was already unsure
of Qari.  The crime on which defendant was acquitted (Count Three, charging a May 21, 2008
heroin sale) related to a DEA operation run by Captain Yaseen, Qari, and Mukhabir, where they
allegedly sold 4 kilograms.  Since Captain Yaseen and Qari were the only participants in the
alleged sale to testify to its occurrence, the jury may well have been unconvinced by Qari's
testimony at trial.  If so, the suppressed evidence that the government failed to follow up on
another agency's adverse credibility determination of Qari could have easily changed the

outcome on this count.  Yet, even if the jury had been comfortable with Qari, once defense counsel had enjoyed a full opportunity to paint the investigation as naively uncritical of the information provided by Qari to the DEA (particularly the information relating to Maftoon), there would simply be no evidence to support Count Four "remaining unscathed."  *Kyles,* 514 U.S. at 451.

It is certainly possible that the jury would have still convicted defendant of the narcoterrorism charge, but all that the law requires is a reasonable probability that, had the credibility evidence been disclosed to defendant, he would not have been convicted. *See Bowie,* 198 F.3d at 908 (citing *Kyles,* 514 U.S. at 434).  Defendant has satisfied that burden with respect to Count Four.  The Court therefore concludes that, because Qari's testimony was indispensable to the narcoterrorism charge and uncorroborated, the government's *Brady* violation undermines confidence in defendant's conviction on Count Four.  To the extent the other two convictions relied on any of Qari's testimony, that testimony was corroborated by a wealth of evidence that had nothing to do with the DEA's careless vetting of Qari.  There is therefore no reason to think that the outcomes as to Counts One and Two would have been different.

### CONCLUSION

For the foregoing reasons, defendant's Motion for a New Trial is granted in part and denied in part, and defendant's conviction in violation of 21 U.S.C §§ 960(a), 841(a) and 841(b)(1)(A) is vacated. A separate Order accompanies this Memorandum Opinion.

/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date:   December 17, 2015