## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 06-CR-334 (ESH)** |
| **HAJI BAGCHO,** | |
| **Defendant.** | |

### Government's Response to Defendant's Motion to Reduce Sentence
### Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)

The United States of America, by and through the undersigned, files this Response in Opposition to Defendant's Emergency Motion for Compassionate Release. The defendant, Haji Bagcho, has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion without prejudice for Defendant's failure to exhaust administrative remedies. Should the Court reach the merits, it should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

### Background

On March 13, 2012, a jury in the District of Columbia found the defendant guilty of one count of conspiracy to distribute one kilogram or more of heroin for importation into the United States; one count of distribution of one kilogram or more of heroin for importation into the United States; and one count of manufacturing, distributing, and possessing one kilogram or more of heroin knowing and intending to provide anything of pecuniary value to any person and organization that has engaged in terrorist activity and terrorism (i.e., "narcoterrorism"). Verdict Form, ECF No. 77. The jury acquitted the defendant on a second heroin distribution charge. *Id.*

The jury's verdict followed a three week trial in which the evidence showed that the defendant oversaw a heroin trafficking organization in Afghanistan that was responsible for distributing enormous quantities of heroin and funneling the proceeds to Taliban commanders so that they could wage war on United States citizens. At the defendant's sentencing, the Court sentenced the defendant to three terms of life imprisonment, to run concurrently, and sixty months of supervised release as required by statute. Sent. Hr'g Tr. 29 30, June 12, 2012. In sentencing the defendant, the Court noted the "astronomical" quantities of drugs involved and the "more than sufficient" evidence that the proceeds from the defendant's heroin operation went to the Taliban. *Id.* at 29.

In April 2015, the Government provided the defendant with information that a U.S. government agency had concluded that a trial witness who testified under the pseudonym "Qari" was a fabricator based on information provided to that U.S. agency by a third party. ECF No. 105 3. After the Government provided the defense with additional information about Qari pursuant to the Classified Information Procedures Act (CIPA), *see* CIPA Disclosure Letter, ECF No. 140, and both parties briefed the issue, in December 2015 the Court entered an Order and Memorandum Opinion granting the defendant's motion for a new trial as to Count Four of the Superseding Indictment, but denying the defendant's motion as to Counts One and Two. ECF Nos. 138, 139. The Court concluded that the impeachment evidence about Qari would not have been admissible at trial to show that Qari was actually a fabricator, but rather to undermine the reliability of the Government's investigation and to show Qari's bias. Memorandum Opinion, ECF No. 139 at 9 24. The Court then conducted a detailed materiality inquiry to determine what effect the impeachment evidence would have had on the verdict. *Id.* at 19-24. The Court concluded that the suppressed evidence was material to the defendant's conviction of narcoterrorism on Count Four

(which relied exclusively on Qari's testimony and was largely uncorroborated by other evidence), but was not material to Counts One and Two, as Count One was "amply corroborated" by physical evidence and other witnesses, and Count Two simply did not involve Qari's testimony. Id. at 21-22. Notably, nowhere in the Order or Memorandum Opinion did the Court conclude that Qari actually was not credible or that his testimony should be stricken.

In January 2016, the Government filed notice indicating that it would not appeal the Court's Order or seek a retrial of the defendant on Count Four. ECF No. 142.  The Court subsequently resentenced the defendant on the remaining two counts on September 6, 2017.

At the September 2017 resentencing hearing, the Court recalculated the defendant's Guidelines range without any reliance upon Qari's testimony. Sent. Hr'g Tr. 10-11, Sept. 6, 2017. In contrast with the Guidelines calculation used at the defendant's 2012 sentencing hearing, the Court declined to apply the twelve-level terrorism enhancement and declined to hold the defendant responsible for a drug quantity exceeding 120,000 kilograms of heroin. Id. at 11-12. Instead, the Court found that the defendant was responsible for at least 10 kilograms of heroin, pursuant to U.S.S.G. § 2D1.1, which included the 3.71 kilogram load that formed the basis for the acquitted count. Id. The Court applied a firearms enhancement of two levels, pursuant to U.S.S.G. § 2D1.1, and a leadership enhancement of four levels, pursuant to U.S.S.G. § 3B1.1(a). Id. at 7. This new calculation resulted in a Total Offense Level of 40 and a range of 292 to 365 months of incarceration. Id. at 13-14. The Court ultimately rejected the defendant's recommendation of 120 months of incarceration and sentenced the defendant to 300 months of incarceration on each count, to run concurrently. Id. at 25.

Following the defendant's resentencing and subsequent appeal, the D.C. Court of Appeals affirmed the District Court's drug quantity calculation, with the inclusion of the acquitted

conduct, but ruled that the firearms enhancement was improperly applied. *United States v. Bagcho*, 923 F.3d 1131, 1140-41 (D.C. Cir. 2019). The case was then remanded to the District Court for the sole purpose of resentencing the defendant without any such enhancement. *Id*. at 1141. Following the remand, the Probation Office filed an amended Presentence Investigation Report finding that the defendant's Total Offense Level was 38, resulting in a Guidelines range of 235-293 months. The defendant's resentencing hearing is scheduled for June 8, 2020. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons ("BOP"), relying on the threat posed by the COVID-19 pandemic.

## I.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.[1]

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan

---

[1] BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum

of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13 to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.[2]

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the

---

[2] Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Attach. 1 (Mem. for Director of Bureau of Prisons). As of May 21, 2020, BOP has transferred 2,932 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP

must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.     Defendant's Request for a Sentence Reduction

Prior to February 2020, the defendant was incarcerated at United States Penitentiary, Allenwood ("USP Allenwood").  He was transported by BOP on February 7, 2020, to the Rappahannock Regional Jail, for temporary detention in advance of his resentencing. Although he was most recently permanently incarcerated at USP Allenwood, and is currently detained at Rappahannock Regional Jail, BOP has redesignated the defendant for incarceration at United States Penitentiary, McCreary ("USP McCreary") following his resentencing.

The defendant has not submitted a request for compassionate release to the warden at USP Allenwood. Nor has he submitted a request to the Director of BOP. By his account, on May 12, 2020, he submitted a request for compassionate release to the warden of USP McCreary. The defendant notes that the associate warden at USP McCreary responded on May 14, 2020 that USP McCreary was unable to process that request because the defendant had not yet been housed there.

On May 14, 2020, Defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A), arguing that his cardiac conditions make him particularly vulnerable to becoming seriously ill from COVID, and that he is more likely to contract COVID in prison than outside of prison. Following receipt of the defendant's motion, the government sought to coordinate with the BOP Office of General Counsel's ("BOP OGC") Legislative and Correctional Issues Branch, the entity within BOP with primary responsibility for evaluating and responding to requests for compassionate release under § 3582(c)(1)(A). After the government alerted BOP OGC to the existence of the defendant's request, BOP OGC conducted an internal review and on May 20, 2020, identified the warden of USP Allenwood as the appropriate entity to conduct an initial review of the defendant's request for early release. On May 21, 2020, the government advised defense counsel that the defendant should submit his request to USP Allenwood rather than USP McCreary.

As of May 21, 2020, one staff member has been infected with, and subsequently recovered from COVID-19, at USP Allenwood, the facility at which the defendant was previously incarcerated.  As of May 21, one inmate and one staff member have been infected with, and subsequently recovered from COVID-19 at USP McCreary, the institution to which the defendant has been designated for transport following his resentencing.

Because the defendant is a citizen of Afghanistan and does not have immigration status in the United States, he is not eligible for home confinement and BOP has not evaluated him for such designation pursuant to its COVID-19 response.

**Legal Framework**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion,

however, the defendant must first request that BOP file such a motion on his or her behalf.

§ 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence

only if the motion was filed "after the defendant has fully exhausted all administrative rights to

appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30

days have passed "from the receipt of such a request by the warden of the defendant's facility,

whichever is earlier." *Id.*

     If that exhaustion requirement is met, a court may reduce the defendant's term of

imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds,

as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and

(ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing

Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that

he or she is eligible for a sentence reduction. *United States v. Keleta*, 552 F.3d 861 (D.C. Cir.

2009).

     The Sentencing Commission has issued a policy statement addressing reduction of

sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court

may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds

that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a

danger to the safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[3]

The policy statement includes an application note that specifies the types of medical

conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if

the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer,

amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG

§ 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of
> the aging process,
>
> that substantially diminishes the ability of the defendant to provide
> self-care within the environment of a correctional facility and from
> which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and

characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's

age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the

possibility that BOP could identify other grounds that amount to "extraordinary and compelling

reasons." USSG § 1B1.13, cmt. n.1(D).

---

[3] The policy statement refers only to motions filed by the BOP Director. That is because the
policy statement was last amended on November 1, 2018, and until the enactment of the First
Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c).
*See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C.
§ 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent
with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii),
and the lack of any plausible reason to treat motions filed by defendants differently from motions
filed by BOP, the policy statement applies to motions filed by defendants as well.

**Argument**

This Court should deny Defendant's motion for a reduction in his sentence without prejudice because he has failed to exhaust his administrative remedies as required. Should the Court reach the merits of his motion, the Court should deny it with prejudice on the ground that the defendant has not met his burden to show that a reduction is warranted in light of the danger that the defendant would pose to the community and the other relevant § 3553(a) factors.

**I.      This Court Should Deny the Motion Without Prejudice Because Defendant Has Not Exhausted Administrative Remedies and Futility Is No Longer at Issue.**

This Court lacks authority to act on Defendant's motion for a sentence reduction at this time. As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or after the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory. The government is very mindful of the concerns created by COVID-19, and BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates while continuing to protect the public from inmates who may pose a danger.

**A.      The Defendant Has Not Exhausted His Administrative Remedies and Thus the Court Does Not Have Jurisdiction to Consider His Request.**

Although the defendant did attempt to lodge a request with the warden of USP McCreary, USP McCreary was not the appropriate entity to process the request. The government concedes that the defendant's position within the administrative designation system of the BOP is somewhat unusual and does not fault the defendant for initially attempting to make his request with USP McCreary. However, now that BOP has administratively determined that USP Allenwood is the appropriate entity to review an initial request for compassionate the release, it

is mandatory that the defendant first submit his request to that facility. When the government informed defense counsel on May 21, 2020, of BOP's administrative determination, counsel did not indicate whether the defendant would submit his request to USP Allenwood.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Section 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." § 3582(c)(1)(A). The requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. As the Third Circuit

recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020). The vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (citing numerous cases).

Consistent with the principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that presented by the defendant; (ii) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and (iii) where the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for a reduction—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). This conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c)

accordingly is understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[4]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id*. at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for a sentence reduction where the defendant has failed to satisfy the exhaustion requirement of § 3582(c)(1)(A).

While the government maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19

---

[4] The Fifth Circuit has recognized that the prerequisites for relief under § 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam).

(holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[5]

**B.     The Defendant's Request to Allenwood USP Would Not Be Futile, and in Any Event, There is No "Futility" Exception to the Exhaustion Requirement.**

At the time the defendant filed his motion for release with this Court, he may have concluded that any effort to seek administrative relief would be futile, given USP McCreary's response. Because BOP has identified USP Allenwood as the appropriate entity to review the request, futility is no longer at issue.[6] BOP must be given the opportunity to fully consider and process the defendant's request, as they regularly do.  Indeed, BOP often concurs with such requests.[7]

Even if the defendant were still facing potential administrative futility, there is no "futility" exception to the statute at issue here. As the Supreme Court has made clear, courts have no authority to invent exceptions to statutory exhaustion requirements. *Ross v. Blake*, 136 S. Ct. 1850, 1857 n.1, 195 L. Ed. 2d 117 (2016) (noting that, in context of statutory exhaustion,

---

[5] Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

[6] In support of his claim that he is in administrative "limbo," the defendant notes in his motion that "even after he is re-sentenced on June 8, 2020, he will not be immediately transported to USP McCreary because the U.S. Marshals are not transporting inmates due to COVID-19" Def. Mot. at 5. To the contrary, on May 20, 2020, the Office of the General Counsel for the United States Marshals Service indicated that the BOP has begun the process of accepting prisoners into quarantine sites, and is placing a greater priority on movement of prisoners considered a part of the "vulnerable population" as outlined in CDC guidelines.

[7] During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

"Congress sets the rules—and courts have a role in creating exceptions [from exhaustion requirements] only if Congress wants them to"; adding that courts also lack discretion to add "extra-statutory" exhaustion requirements). Two district courts have recently rejected the argument that any such futility exception exists under § 3582. *See United States v. Holden*, 2020 WL 1673440, at *5 (D. Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020). While a few district courts have incorrectly excused the § 3582 exhaustion requirement as futile, two of those decisions rested on the fact that the defendants had a matter of days left to serve on their sentences, a consideration not present in this case. *See United States v. Colvin*, 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020) (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). At least one of those decisions incorrectly relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement. *See Perez*, 2020 WL 1546422 at *2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).[8] The requirement of a

---

[8] To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at *2 n.2, that is incorrect. In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000). And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, the defendant's claim for relief in this Court is the same claim he was required to present to BOP. *See also United States v. Demaria*, 2020 WL 1888910, at *3 & n.8 (S.D.N.Y. Apr. 16, 2020) (explaining the *Perez* error at length and the inapplicability of the cases on which it relied).

**Gov't Resp. to Def. Mot. to Reduce Sentence**                                              **17**

30-day period to afford BOP the initial review of the defendant's request therefore cannot be

excused.[9]

---

[9] A handful of courts, mostly in the Second Circuit, have agreed in recent weeks with *Perez* that the exhaustion requirement may be negated. *See also, e.g.*, *United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (11 days remaining on sentence); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (26 days remaining on sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020); *United States v. Paciullo*, 2020 WL 1862252, at *2 (S.D.N.Y. Apr. 14, 2020) (court strikes a "compromise" and allows BOP 20 days); *United States v. Russo*, 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020).

Contrast that with virtually every other district court in the country to consider this issue in a reported decision, all of which agree with *Raia* and the government here that the 30-day requirement must be enforced. *See, e.g., United States v. Gillis*, 2020 WL 1846792 (C.D. Cal. Apr. 9, 2020); *United States v. Meron*, 2020 WL 1873900 (E.D. Cal. Apr. 15, 2020); *United States v. Hembry*, 2020 WL 1821930 (N.D. Cal. Apr. 10, 2020); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020); *United States v. Perry*, 2020 WL 1676773 (D. Colo. Apr. 3, 2020); *United States v. Zywotko*, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020); *United States v. Read-Forbes*, 2020 WL 1888856 (D. Kan. Apr. 16, 2020); *United States v. Boyles*, 2020 WL 1819887 (D. Kan. Apr. 10, 2020); *United States v. Carter*, 2020 WL 1808288 (S.D. Ind. Apr. 9, 2020); *United States v. Hofmeister*, 2020 WL 1811365, at *3 (E.D. Ky. Apr. 9, 2020) (explaining that the rule is jurisdictional, and perhaps even more necessary during COVID-19 crisis); *United States v. Reeves*, 2020 WL 1816496 (W.D. La. Apr. 9, 2020); *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (extensive analysis, concluding, "The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Johnson*, 2020 WL 1663360, at *3-*6 (D. Md. Apr. 3, 2020) (concluding in lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Underwood*, 2020 WL 1820092 (D. Md. Apr. 10, 2020); *United States v. Carden*, 2020 WL 1873951 (D. Md. Apr. 15, 2020); *United States v. Alam*, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020); *United States v. Mathews*, 2020 WL 1873360 (E.D. Mich. Apr. 15, 2020); *United States v. Annis*, 2020 WL 1812421, at *2 (D. Minn. Apr. 9, 2020) (Tunheim, C.J.) ("There is no question that COVID-19 is a cause for alarm, and the Court does not fault Annis's concerns, given his health conditions. However, given the scale of the COVID-19 pandemic and the complexity of the situation in federal institutions, it is even more important that Annis first attempt to use the BOP's administrative remedies."); *United States v. Gardner*, 2020 WL 1867034 (D. Minn. Apr. 14, 2020); *United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020); *United States v. Ogarro*, 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) (lengthy analysis, stating, "In fact, section 3582(c)'s exhaustion proscription is clear as day."); *United States v. Pereyra-Polanco*, 2020 WL 1862639 (S.D.N.Y. Apr. 14, 2020); *United States v. Roberts*, 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 2020 WL 1673253 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, 2020 WL 1674137 (S.D.N.Y. Apr. 6, 2020); *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (follows "vast majority" of courts); *United States v. Schultz*, 2020 WL 1872352 (W.D.N.Y. Apr. 15, 2020); *United States v. Allen*, 2020 WL 1878774 (N.D. Ohio Apr. 15, 2020); *United States v. Simmons*, 2020 WL 1903281 (D. Or. Apr. 17, 2020); *United States v. Holden*, 2020 WL 1673440 (D. Or. Apr. 6, 2020) (very extensive discussion); *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (cites numerous cases in agreement); *United States v. Petrossi*, 2020 WL 1865758 (M.D. Pa. Apr. 14, 2020); *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020); *United States v. Fuller*, 2020 WL 1847751 (W.D. Wash. Apr. 13, 2020); *United States v. Carver*, 2020 WL 1604968 (E.D. Wash. Apr., 1, 2020); *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense. The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.").

While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies. And this is for good reason: BOP conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, the BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must balance a host of considerations in deciding whether to recommend a reduction in an inmate's sentence or grant the inmate home confinement—not only the health of the inmate and BOP staff, but also the safety of the public. BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations in light of an inmate's background and medical history and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2. *See also United States v. McCann,* 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

Accordingly, Defendant's motion should be denied without prejudice to refiling once he has exhausted administrative remedies.

## II. The Defendant's Arguments Regarding "Extraordinary and Compelling Reasons" for a Sentence Reduction.

As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness; and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*,

2020 WL 1647922 at *2; *see also Eberhart*, 2020 WL 1450745 at *2 ("a reduction of sentence

due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy

statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[10] To classify the risk

of COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the

text of the statute and the policy statement, but would be detrimental to BOP's organized and

comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates,

and would undercut the strict criteria BOP employs to determine individual inmates' eligibility

for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence

reductions for specific individuals, not the widespread prophylactic release of inmates and the

modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

 That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a

motion under § 3582(c)(1)(A). If an inmate has a chronic medical condition that has been

identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[11]

that condition may satisfy the standard of "extraordinary and compelling reasons." Under these

circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to

---

[10] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

[11] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

**Gov't Resp. to Def. Mot. to Reduce Sentence**       **22**

recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. USSG § 1B1.13, cmt. n.1(A)(ii)(I). Similarly, in light of COVID-19, a defendant "experiencing deteriorating physical or mental health because of the aging process" may be found to have a substantially diminished ability to provide self-care within the environment of a correctional facility, even where the defendant's age-related decline in health otherwise would not have qualified. USSG § 1B1.13, cmt. n.1(A)(ii)(III).] But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution. As noted above, neither USP Allenwood nor USP McCreary have experienced a severe outbreak of the disease.

In this case, Defendant has asserted that he suffers from coronary artery disease, chronic congestive heart failure, irregular heartbeat, and associated cardiac ailments, and that these conditions make him more vulnerable to becoming seriously ill should he contract COVID-19. To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical

condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

As a threshold matter, the defendant has not been diagnosed with a "terminal illness," defined as "a serious and advanced illness with an end of life trajectory," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." U.S.S.G. § 1B1.13, Application Note 1(A)(i).[12] The defendant's primary identified conditions are chronic vascular and heart disease. These ailments are, unfortunately, extremely common ones. Recent studies indicate that approximately 18.2 million American adults age 20 and older, or about 6.7% of the population, have coronary artery disease—the most common form of heart disease.[13] Similarly, 6.5 million Americans are currently living with congestive heart failure.[14] Coronary artery disease and congestive heart failure are chronic, progressive conditions, with variable courses and prognoses that can evolve over decades.[15] In their early stages they often cause no symptoms and do not interfere with routine daily life.[16] To this point,

---

[12] Additionally, a BOP program statement notes that a reduction in sentence consideration "may be given to inmates who have been diagnosed with a terminal, incurable disease and whose life expectancy is eighteen (18) months or less, and/or has a disease or condition with an end-of-life trajectory under 18 USC § 3582(d)(1)," suggesting that a "terminal illness" may be considered as co-extensive with one whose life expectancy is less than 18 months. BOP Program Statement 5050.50, "Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)," at 4 (Jan. 17, 2019).

[13] Centers for Disease Control and Prevention, *Heart Disease Facts*, https://www.cdc.gov/heartdisease/facts.htm.

[14] Centers for Disease Control and Prevention, *Heart Failure*, https://www.cdc.gov/heartdisease/heart_failure.htm.

[15] Cleveland Clinic, *Heart Failure*, https://my.clevelandclinic.org/health/diseases/17069-heart-failure-understanding-heart-failure/management-and-treatment.

[16] National Institutes of Health, *Coronary Heart Disease*, https://www.nhlbi.nih.gov/health-topics/coronary-heart-disease; Cedars-Sinai Medical Center, *Heart Failure*, https://www.cedars-sinai.edu/Patients/Health-Conditions/Heart-Failure.aspx.

in the defendant's most recent examination by his cardiologist, the treating physician noted that the defendant had "no symptoms," was "overall feeling well," and specifically denied experiencing any lower extremity swelling, chest pain, dizziness or palpitations—some of the most common symptoms of congestive heart failure. Def. Mot. Ex. A at 1. Asymptomatic congestive heart failure such as the defendant's is typically managed through "lifestyle changes, heart medications, and monitoring,"[17] all of which are accessible to him.

In the defendant's case, neither of these common chronic conditions, which are well-managed with medications and monitoring, are "advanced illnesses" with an "end-of-life trajectory." The defendant has received no terminal prognosis, and by his own account his conditions are asymptomatic and do not cause discomfort. *See* Def. Mot. Ex. A at 1. Indeed, the defendant's medical records indicate that during his most recent evaluation, his provider determined that he need only receive a follow-up assessment for these conditions a year later. *Id.* at 4. This assessment plainly forecloses any argument that the defendant's current conditions are "terminal illnesses" within the meaning of the guidelines.

With respect to the second category, i.e., that the defendant has a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," the defendant's conditions in and of themselves do not prevent him for providing self-care with a correctional facility. The medical records appended to the defendant's motion indicate that he regularly sees a medical provider for his conditions, that he is prescribed an appropriate regimen of medications to address them, that he understands and is able to comply

---

[17] Healthline, *Congestive Heart Failure*, https://www.healthline.com/health/congestive-heart-failure

**Gov't Resp. to Def. Mot. to Reduce Sentence**                                    **25**

with treatment regimen, and that the medications he is prescribed do not cause side effects.[18] *See* Def. Mot. Ex. A at 1, 4; Def. Mot. Ex. D at 1-2 (noting compliance with treatment regimen and lack of side effects); Def. Mot. Ex. C at 1-2 (detailing list of prescribed medications).

However, the Centers for Disease Control and Prevention ("CDC") has identified risk factors that place individuals at higher risk of severe outcomes from COVID-19. The government acknowledges that, during the current COVID-19 pandemic, an inmate who presents one of these CDC risk factors, as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release. Specifically, CDC has identified "serious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension," as one such risk factor. As noted above and reflected in his BOP medical records, the defendant has been diagnosed with congestive heart failure and coronary artery disease.

The government concedes that, during the current COVID-19 pandemic, such a chronic medical condition presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death

---

[18] The defendant's medical records do indicate that while certain of the medications he is prescribed are to be taken twice daily, the defendant reported to his cardiologist that he was only taking them once daily.  *See* Mot. Ex. A at 1, 4.  The resulting provider's note directs the defendant to take the medication twice daily; assumedly this deviation from his treatment protocol is within the defendant's power to correct.

as a result of COVID-19 is substantially diminished, within the environment of a correctional

facility, by the chronic condition itself.

**III.    The Factors Set Forth in 18 U.S.C. § 3553(a) Justify Denial of the Defendant's Motion for Early Release.**

Despite his diminished ability to provide self-care due to the COVID-19 pandemic, the

defendant's request for a sentence reduction should nonetheless be denied because he has failed

to demonstrate that he is not a danger to the safety of the community, or that he otherwise merits

release under the § 3553(a) factors.

Upon consideration of a request for compassionate release pursuant to 18 U.S.C. §

3582(c)(1)(A), the Court must look to the sentencing factors set forth in 18 U.S.C. § 3553(a) as

part of its analysis. Here, the Court should consider the ample evidence demonstrating that the

defendant was the leader of a vast heroin trafficking organization responsible for distributing,

and planning to distribute, enormous quantities of highly pure heroin. The majority of this

evidence derived from witnesses and information unrelated to Qari. Given the nature and

circumstances of the defendant's offense, the defendant's position at the very top of a vast drug

empire, and the need to protect the public, the factors set forth in 18 U.S.C. § 3553(a) weigh

strongly against a sentence reduction and early release.

**A.    The Nature, Circumstances, and Seriousness of the Offense Weigh Heavily against the Defendant's Request for Early Release.**

**1.    Drug Quantity**

The defendant led a prolific drug trafficking organization responsible for the distribution

of a staggering amount of heroin. While this Court elected to limit its calculation at the

defendant's resentencing, the government encourages the Court to consider the full breadth of

evidence presented at trial when considering the defendant's early release request. Even without

relying on Qari's testimony, the evidence referenced below establishes that the defendant is responsible for the distribution of a drug quantity totaling over 100,000 kilograms of heroin.

First, the Court should consider the ledger books introduced at trial that demonstrated that between March 2006 and March 2007, just one year of the charged conspiracy, the defendant's criminal organization was responsible for producing and selling approximately 123,000 kilograms of heroin, valued at more than $261,000,000. *See* Trial Tr. Vol. 12, 109-147. The testimony at trial established that the ledgers were recovered during a court-authorized search of Haji Bagcho's and Farman Shah's compounds conducted by Afghan police and DEA agents on November 27, 2007.  Trial Tr. Vol. 11, 14-16. Notably, the defendant's name was printed on the inside cover of one of the ledgers, marking it as his property. The ledgers were retrieved from a latrine in Farman Shah's house, which was adjacent to the defendant's compound, and were admitted as Exhibits 31 and 32.  Trial Tr. Vol. 11, 26-28. The evidence at trial established that Farman Shah was the defendant's heroin chemist and was a member of the defendant's criminal organization For example, Colonel Shaheen testified that the defendant stated that he had traveled with his chemist to Japan to fix a damaged heroin load. Trial Tr. Vol. 7, 90-91 Additionally, a search of the defendant's compound on October 9, 2006, recovered an IOU from Farman Shah, which referenced money owed by Shah to the defendant in relation to their dealing in Japan. Trial Tr. Vol. 3, AM session, 104-35, 135. Captain Yaseen also testified that the search of Shah's compound conducted on November 27, 2007, recovered a ticket for a flight to Tokyo, Japan, for Farman Shah.  Because the evidence established that Farman Shah and the defendant worked together as members of the same criminal conspiracy, and because the defendant's name was printed on the seized ledgers, the heroin quantities described in the ledgers should be attributed to the defendant.  *United States v. Wilson*, 605 F.3d 985, 1036 (D.C. Cir. 2010)

("Drugs distributed by a co-conspirator in furtherance of a conspiracy are attributable to a member of the conspiracy so long as the distribution was reasonably foreseeable to that member.") (quotation marks omitted).

In addition to the quantities contained in the above-referenced ledgers, additional evidence established that the defendant's organization intended to send large quantities of heroin to the United States. Captain Yaseen testified that he, in an undercover capacity, posed as a middle man intending to introduce the defendant to a Japanese buyer who was interested in sending heroin to America. *See, generally*, Trial Tr. Vol. 11, 99-111. During the course of these conversations, 3.71 kilograms of heroin was purchased from the defendant with the expectation that larger quantities would follow. For example, in Trial Exhibit 26D, a recorded telephone conversation, an individual named Mukhabir told the defendant that the Japanese buyer was very happy with the merchandise and wanted to do "good business" together in the future, likely 50 or 100 kilograms or more. The defendant then suggested a face-to-face meeting to discuss further. In Trial Exhibit 26E, a recorded telephone conversation, the defendant confirmed with Captain Yaseen that Qari told him the buyer wanted an additional 50 kilograms. Captain Yaseen confirmed, adding that it is possible it will be up to 75 kilograms. Later in the same call, Captain Yaseen noted that in the future, the deals will possibly involve 100, 200, even 500 kilograms. The defendant responded that once they could complete additional deals, then they would each know what kind of person the other was, and that people who are dealing with them will not be upset. In Trial Exhibit 26F, a recorded telephone conversation, as the parties were still attempting to schedule a face-to-face meeting, Captain Yaseen told the defendant that the buyer in Japan wanted 10 kilograms to send to America. Captain Yaseen stated that the buyer had asked for more, possibly more than 100 kilograms, but needed 10 kilograms immediately. The

defendant responded, "I see." These planned future dealings, which were to follow the successful sample purchase of 3.71 kilograms, indicate an unambiguous intent to send large amounts of heroin to America.

Considering the drug quantities involved in the overall conspiracy, totaling over 120,000 kilograms of heroin, the seriousness of the defendant's crime is significant and weighs heavily against his early release.

### 2.    Drug Purity

Testimony at trial showed that seized quantities of the defendant's heroin tested within a range of 81-85 percent pure. Trial Tr. Vol. 4, 45. This is in the upper range in terms of the quality of heroin historically seized by law enforcement in Afghanistan, and corroborates the defendant's prominent role in the enterprise and close proximity to the source of the drugs. Expert witness Robert Thompson testified that samples of heroin seizures from Afghanistan range from 5 percent purity up to 90 percent purity, placing the defendant's heroin near the top of the quality and purity scale. Trial Tr. Vol. 4, 44-45. Expert witness Edward Follis testified that street-level heroin has an average purity of 7%, again showing that the heroin in this case was of exceptional quality and purity, garnering a significant profit return for the defendant. Trial Tr. Vol. 10, 155. The unusually high purity of the defendant's heroin highlights the severity of the defendant's conduct as well as his prominent role in the conspiracy.

### 3.    Leadership

Evidence at trial established, and this Court has previously found, that the defendant was a leader within his organization. As detailed at length in the government's 2017 Sentencing Memorandum, testimony and evidence presented at trial, to include recorded calls of the defendant himself, showed that the defendant led an organization consisting of chemists, packing specialists, transporters, smugglers, and money exchangers. He bragged on a recorded call that

he had associates abroad, ready to facilitate a large heroin deal. He traveled internationally with his chemist to remedy a damaged load. He had an associate bribe a local law enforcement agent, in furtherance of his heroin trafficking business. The Court noted that the defendant led a "large operation" that required "the growing of the poppy[,] [p]rocessing, harvesting, packaging, and transporting the heroin to buyers, many of whom were outside of Afghanistan." Sent. Hr'g Tr. 6, Sept. 6, 2017. There is no doubt that the defendant was a leader of a significant, successful, international drug trafficking organization. Given the wide-reaching nature of his conduct and his position at the top of his organization, early release is not appropriate.

B.   **Given the Enormous Quantity Of Heroin Trafficked by the Defendant's Organization and the Defendant's Connections to a Foreign Terrorist Organization, Protection of the Public Continues to Be a Critical Consideration In This Case**

The factors set forth in 18 U.S.C. § 3553(a) compel the Court to assess the need to protect the public from future crimes of the defendant. When ruling on the defendant's motion for early release, his potential danger to the community—both within the United States and throughout the world—weighs heavily against terminating his sentence and allowing him to immediately return to Afghanistan. As explained above, the defendant's organization was responsible for flooding the world market with an enormous quantity of heroin, a significant portion of which was intended for the United States. Testimony at trial also established that during the course of the drug trafficking conspiracy, the defendant provided support to the Taliban, a foreign terrorist organization.[19] His means and motivation to reengage with these enterprises justify his continued incarceration until his sentence is complete.

---

[19] As the government argues below, the Court should consider Qari's testimony for the purpose of ruling upon the defendant's motion for compassionate release.  However, even if the Court chooses not to consider evidence relating to the Taliban, the defendant's drug trafficking conduct alone warrants a need to protect the public.

**1.    The Defendant's Position at the Top of a Prolific Drug Trafficking Organization Makes Him a Continued Danger to the Public.**

The evidence at trial demonstrated that the defendant oversaw a vast heroin trafficking organization intent on sending large quantities of heroin to the United States for profit. Organized international drug trafficking on the scale perpetuated by the defendant poses a grave threat to the national interests of the United States and other countries targeted by heroin traffickers. The toll that the drug trafficking industry takes on the United States each year is astronomical, as heroin abuse fuels the destruction of lives, families, and communities. Given the quantity of heroin for which the defendant's organization was responsible, the defendant doubtless contributed significantly to the ongoing opioid crisis affecting the United States.

The evidence at trial showed that the defendant is one of the largest drug traffickers, as measured by share of global production, to ever be prosecuted in the United States. The defendant was a significant producer of heroin even prior to the time period addressed in the indictment, purchasing tons of opium annually at the Ghani Khel bazaar to convert into heroin. By 2006, during only a portion of the time period relevant to the indictment, the defendant was responsible for trafficking a massive 123,000 kilograms of heroin in the 12-month period ending in March 2007. Expert witness David Keiken testified at trial that this amounted to approximately 19% of all heroin produced globally that year. Trial Tr. Vol. 12, 147-48. The evidence at trial further established that the defendant attempted to bribe public officials and threatened cooperating witnesses, all to ensure the continued success of his drug trafficking empire. Because drug trafficking, especially large-scale trafficking of enormous quantities of heroin, poses a risk to the public, both in the United States and throughout the world, the protection of the public from the defendant's further crimes is paramount.

Allowing the early release of the defendant would give him the opportunity to return to his drug trafficking organization and resume his criminal activity. Notably, the defendant was originally charged with two codefendants in this case. Because the government was unable to secure their presence via arrest and extradition here in the United States, their cases were dismissed without prejudice. Thus, his most trusted coconspirators remain at large in Afghanistan. There is a significant risk that upon an expedited return to Afghanistan, with his sentence significantly reduced, the defendant will reengage with his coconspirators and resume his dangerous and illegal activities undeterred.

### 2.   Evidence at Trial Established that the Defendant Used His Drug Proceeds to Support the Taliban.

Should this Court elect to consider Qari's testimony, the government notes that Qari testified that the defendant directed his son and codefendant, Sucha Gul, to make monetary payments to Taliban leaders, such as Maftoon and Maulawi Kabir, and that the defendant provided weapons, food, and other supplies to Commander Khona.[20] Trial Tr. Vol. 9, 88; 100-03; 116-120; 135-42. Qari further testified that the defendant encouraged others to give money to the Taliban with the express goal of driving the United States out of Afghanistan, equating the payments to jihad. Trial Tr. Vol. 9, 125; 140-42. Expert witness Edward Follis provided context about the symbiotic relationship between drug traffickers and Taliban leaders, in which the Taliban allowed drug traffickers to continue their operations, while in return, drug traffickers provided financing for the Taliban to pursue their insurgency. Trial Tr. Vol. 10, 158-59. Colonel Shaheen testified to this as well, noting that heroin traffickers chose to operate in Taliban

---

[20] Both Farid and Colonel Shaheen confirmed that Maulawi Kabir was a Taliban governor in Nangarhar.  Trial Tr. Vol. 4, 73; Trial Tr. Vol. 7, 63.  Colonel Shaheen testified about Maftoon and Khona's positions as Taliban commanders, fighting against the government.  Trial Tr. Vol. 7, 64-67.

controlled areas because the Taliban would protect them; in return, traffickers made monetary payments to the Taliban. Trial Tr. Vol. 7, 159-60.

The evidence summarized above establishes that the defendant conspired with others to provide support to a terrorist organization, the Taliban.[21] The Taliban operates in Afghanistan and Pakistan. It is currently, and was at the time of the defendant's offenses, dedicated to overthrowing the government of Afghanistan and ousting U.S. and allied forces. The defendant knew that the Taliban planned to commit acts in Afghanistan that would constitute acts of terrorism and violence, and he knew of the Taliban's openly stated goals and objectives. The defendant provided pecuniary support to the Taliban while engaged in a drug trafficking offense, and he encouraged others to do the same. Ultimately, the defendant was well versed about the Taliban, the governments operating in the region, and the influence the Taliban sought to have on those governments. The defendant's underlying actions show his intent to support the Taliban in principal and in practice.

There is no indication that the defendant has softened his views since he was first sentenced. Given the defendant's prior support of the Taliban, to allow him to return to Afghanistan—where the Taliban's campaign of terrorism and violence continues[22]—years earlier than his sentence prescribes would risk reviving the defendant's criminal activities and the terrorist sympathies they represent.

---

[21] Stipulation of Fact Number 4, presented at trial, stated that both parties agreed that "the Taliban is a terrorist organization in that it is comprised of a group of two or more individuals which has engaged or engages in or has a subgroup which has engaged or engages in terrorist activity."

[22] *See, e.g.,* Mujib Mahsal, *Taliban Ramps Up Attacks Even as Coronavirus Spreads in Afghanistan,* N.Y. Times (Apr. 24, 2020), https://www.nytimes.com/2020/04/24/world/asia/taliban-attacks-afghanistan-coronavirus.html.

**3.      This Court Can and Should Consider Qari's Testimony when
Considering the Danger the Defendant Poses to the Community.**

In considering the defendant's motion for release, this Court can and should rely on

Qari's testimony, as none of its prior orders require that the Court ignore Qari's testimony or its

bearing upon the defendant's request. This Court will recall that a government agency made an

adverse credibility assessment of Qari based upon third-party information, which the government

discovered after the conclusion of the defendant's trial. The agency's credibility determination

regarding Qari was, at its heart, based on uncorroborated hearsay. *See* Letter to Sandra Roland,

ECF No. 140, at 1 (stating that the agency's credibility finding as to Qari was based on third-

party hearsay, and that the agency never verified the information or met with Qari);

Memorandum Opinion, ECF No. 139, at 13 ("[T]he Court must agree that the agency

determination is inadmissible for proving the truth of the matter asserted—that Qari *is*, in fact, a

fabricator."). Following disclosure of this material to defense counsel and after extensive

briefing, the Court evaluated the effect of the withheld information on the verdict, finding that

the information was material not because it could have been introduced for its truth, but because

it could have been used to cast doubt on the reliability of the investigation or to show Qari's bias.

*Id.* at 13-16. At no point did the Court actually conclude that Qari had testified incredibly, that

his testimony should be stricken, or that the parties could not rely on his testimony in

proceedings such as this one.

This Court observed Qari's testimony first-hand and is therefore in the best position to

choose what weight to give his assertions. The government respectfully submits that the

speculative nature of the government's disclosure regarding Qari, the Court's own opportunity to

evaluate Qari's credibility, and the fact that some of Qari's testimony was in fact corroborated by

other evidence at trial, all weigh in favor of this Court crediting Qari's testimony for purpose of ruling on the defendant's motion for early release.

*   *   *

The statute allowing for compassionate release requires that the Court consider the factors set forth in 18 U.S.C. § 3553(a) when weighing the risks of a sentence reduction and early release. 18 U.S.C. § 3582(c)(1)(A). Based upon those factors, to include the nature and circumstances of the offense, the severity of the offense, and the need to protect the community, the defendant is not a suitable candidate for a sentence reduction, despite the COVID-19 pandemic. Even if this Court chooses to rely only on testimony and evidence unrelated to Qari, as it did at the defendant's resentencing hearing, the evidence relating to drug quantity, drug purity, and leadership indicate a continued need to protect the public and weigh heavily against early release. Accordingly, taking the §3553(a) factors into account, the defendant's motion should be denied.

**C.   The Defendant's Release Plan is Wholly Inadequate and Likely not Viable Given the Current Circumstances of the COVID-19 Pandemic.**

As noted above, due to the COVID-19 pandemic, many BOP inmates are being evaluated for suitability for home confinement. Due to his immigration status, the defendant is ineligible for evaluation under this program. With home confinement foreclosed to him, the defendant presents as an alternative that he simply be immediately released back into the community in Afghanistan. In the normal course, if the Court granted a sentence reduction, it might "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). Such a period of supervised release, including a potential accompanying period of home confinement (see USSG § 5F1.2; 18 U.S.C. § 3583(d) and (e)(2)) would allow the court to monitor the defendant and potentially

check or mitigate the danger to the community that he poses. However, given that the only option for release would be immediate transport to a foreign country, the Court would have no means of supervising the defendant and thereby mitigating that threat.

Moreover, given current COVID-19 related travel restrictions, the possibility of an immediate deportation is essentially non-existent. Presumably, upon release from the Bureau of Prisons, the defendant would be taken into custody by Immigration and Customs Enforcement ("ICE") for removal back to Afghanistan. Upon consultation with the government on May 19, 2020, a Detention & Deportation supervisor from ICE indicated that to effectuate the defendant's removal, he would need to be escorted on a series of flights back to Afghanistan. However, due to COVID-19, ICE is not currently performing any escorted removal flights and has not identified a time at which such flights will resume.

Further, once escorted removals do resume, ICE would need to obtain travel documents from Afghanistan to allow the defendant to travel there, given that the defendant's passport has presumably expired. Because no carriers are flying directly to Afghanistan from the United States, ICE would also have to obtain visas from the various countries through which the defendant would need to transit en route to Afghanistan. Any plan to remove the defendant to Afghanistan, would likely therefore take multiple weeks or months to effectuate.

## Conclusion

For these reasons, this Court should deny Defendant's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.

Respectfully submitted,

Marlon Cobar (CA Bar No. 224218)
Acting Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

_____/s/_ _Seth Gilmore_____
Seth Gilmore (VA Bar No. 80397)
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division / U.S. Department of Justice
145 N. Street, NE
Washington, DC 20530
Tel: (202) 445-9076
seth.gilmore@usdoj.gov

Jamie Perry (MD Bar No. 1012160031)
Trial Attorney
Human Rights and Special Prosecutions
Criminal Division / U.S. Department of Justice
1301 New York Ave. NW
Room 3407
Washington, D.C. 20530
Tel: (202) 307-3262

Erin Cox (IL Bar No. 6308801)
Trial Attorney
Human Rights and Special Prosecutions
Criminal Division / U.S. Department of Justice
1301 New York Ave. NW
Room 3006
Washington, D.C. 20530
Tel: (202) 598-2771

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent via e-mail, to counsel of record for

the defendant, this 21st day of May, 2020.


By:        /s/ *Seth Gilmore*
Seth Gilmore
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice